The **MONARCH INSURANCE COMPANY OF OHIO**, Plaintiff,

v.

**DISTRICT OF COLUMBIA** and **United States of America et al.**, Defendants.

Civ. A. No. 1152–69.

United States District Court, District of Columbia.

Jan. 22, 1973.

Denver H. Graham, Washington, D. C., for plaintiff.

John A. Earnest, John H. Suda, Asst. Corporation Counsels, Washington, D. C., for defendants District of Columbia, Walter E. Washington and John B. Layton.

Harold H. Titus, Jr., U. S. Atty., William E. Nelson, J. Charles Kruse, Department of Justice, Washington, D. C., for defendant United States of America.

## OPINION

WILLIAM B. JONES, District Judge.

This civil action, along with several others which have been consolidated with it before this Court, arises from the civil disturbances which followed the assassination of Dr. Martin Luther King in April, 1968. Plaintiff, a corporation primarily engaged in writing and issuing fire, extended coverage and other policies of insurance, paid claims to several of its insureds as a result of riot damage and is consequently subrogated to those claims which it asserts in this case. Defendants are The United States of America; The District of Columbia; Walter E. Washington, Commissioner of the District of Columbia; John B. Layton, who at the time in question was Chief of the Metropolitan Police Department of the District of Columbia; John Doe, Mary Doe, Richard Roe and Mary Roe, unknown citizens of the United States and residents of the District of Columbia.

The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1343, 1346(a)(2), 1346(b), 2671 et seq., (1970) and D.C.Code § 11–521 (1967 ed.). Defendant United States of America has moved to dismiss the action for failure to state a claim upon which relief can be granted or in the alternative for summary judgment; defendants District of Columbia, Walter E. Washington, and John B. Layton have moved to dismiss for failure to state a claim upon which relief can be granted.

Plaintiff's complaint in several counts alleges essentially that the United States and the District of Columbia were negligent in their preparation and implementation of plans to suppress any riot or civil disturbance in the District of Columbia, and that their delay in sending in police and troops and their failure to assign forces properly constituted negligence and a taking of plaintiff's property * under the Fifth Amendment as well as a denial of the equal protection of the laws. Plaintiff bases its cause of action against the United States, the District of Columbia and the named officials of the District of Columbia on the following grounds: (1) violation of 42 U.S.C. § 1983 (1970); (2) violation of the Fifth and Fourteenth Amendments to the United States Constitution in that defendants' actions constituted a taking of its property for public use without just compensation and a denial of due process and of the equal protection of the laws; and (3) violation of a common law duty to protect plaintiff's property and to compensate it for losses resulting from civil disorders.

Against the United States alone, plaintiff asserts a cause of action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. (1970), and under Article IV, Section 4 of the United States Constitution for the alleged negligent failure to protect the District of

---

* Plaintiff's property, as referred to in this opinion, is the property of plaintiff's insureds which was destroyed in the riots.

The plaintiff actually asserts its claims as subrogee by reason of its payments to its insureds under its policies.

Columbia "against domestic violence." Each of plaintiff's claims will be treated separately below.

## I.

### Claims Against the United States

■ In Count I of its complaint, plaintiff alleges that during twelve days of civil disorders in April, 1968, "all Defendants deprived Plaintiff's subrogors of their rights, privileges and immunities secured by the Constitution and laws in violation of 42 U.S.C. § 1983, and are liable for redress of damages therefor." By its terms, however, 42 U.S.C. § 1983 (1970) is inapplicable in suits against the United States.[1] That statute provides a remedy against *persons* acting under color of *state* authority and does not provide redress against the United States. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 373, 5 L.Ed.2d 492 (1967); Davis v. United States, 439 F. 2d 1118 (8th Cir. 1971); Norton v. McShane, 332 F.2d 855 (5th Cir. 1964), cert. denied, 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965); Broome v. Simon, 255 F.Supp. 434, 440 (E.D.La. 1966).

Counts II and VIII of plaintiff's complaint allege a violation by the United States of the Fifth and Fourteenth Amendments on the ground that the actions taken by the United States during the civil disorders in the District of Columbia constituted a taking of plaintiff's property for public use without just compensation and a denial of due proc-

ess and of the equal protection of the laws. Each of those allegations will be examined separately.

■ The equal protection clause of the Fourteenth Amendment applies only to discriminatory state action and not to actions taken by the United States (or the District of Columbia), which are governed by the due process clause of the Fifth Amendment. See Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Although plaintiff's complaint alleges a denial of due process as well as a denial of the equal protection of the laws, its claim of a denial of due process arises from its claim that the actions of the United States constituted a taking of plaintiff's property for public use without just compensation. That is the force of the allegation in Count VIII of plaintiff's complaint, which states that:

> The defendants, United States of America and the District of Columbia, in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States, did effectively take the property of plaintiff's subrogors for public use without just compensation and did deprive them of real and personal property without due process of law.

■ But if plaintiff's claim of denial of due process arises solely from its claim of a "taking" without just compensation, plaintiff has a recognized cause of action under the Tucker Act, 28 U.S.C. § 1346(a)(2),[2] and a claim of de-

---

1. 42 U.S.C. § 1983 (1970) provides:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. 28 U.S.C. § 1346(a)(2) provides:
   (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
   &ast; &ast; &ast; &ast; &ast;
   (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

nial of due process based on the same matter is superfluous.

■ In Part V of plaintiff's memorandum in opposition to the motion of the United States to dismiss or in the alternative for summary judgment, plaintiff contends that:

" . . . defendant's failure to protect, and its deliberately not protecting, the insureds' properties and businesses in accordance with its legal duty to do so, deprived the insureds of their property without due process of law and, in contrast to cases in which the defendant, on the same or on other occasions, effectively acted to protect private property, deprived the insureds also of their right to equal protection of the laws, all in violation of the Fifth and Fourteenth Amendments to the Constitution." Plaintiff's Memorandum at 43–44.

But such a claim of denial of due process and of equal protection of the laws is actually founded on some "negligent or wrongful act or omission," 28 U.S.C. § 2671 (1970), which gives rise to a cause of action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. (1970), and again a constitutional claim based on the same matter is superfluous.

Plaintiff contends nevertheless that "the due process and equal protection clauses define substantive *rights* in that they measure defendant's constitutional *duties,* and that plaintiff has a *cause of action* to recover damages for defendant's violation of these 'federally protected rights' by virtue of the jurisdictional statutes cited in the complaint, namely, Title 28, United States Code, Section 1346(a) and Section 1346(b) . . . ('negligent or wrongful act or omission')." Plaintiff's Memorandum at 44.

Again plaintiff links its constitutional claims to recognized causes of action authorized by Congress in 28 U.S.C. §§ 1346(a)(2) and 1346(b) (1970). Plaintiff, however, reads into 28 U.S.C. § 1346(a)(2) a cause of action against the United States for damages based on the violation of any constitutional provision.[3] In light of that position and in light of this Court's finding, set out more fully below, that the plaintiff has not shown a taking of its property by the United States without just compensation and that the plaintiff's claim under the Federal Tort Claims Act must fail by reason of the discretionary function exception under 28 U.S.C. § 2680(a) (1970), it should be made clear that plaintiff under the circumstances of this case has no independent cause of action for damages against the United States based upon a claim of violation of the due process and equal protection clauses of the Constitution.

■ A suit to recover damages suffered as a result of a denial of a constitutional guarantee can be brought against the United States only if a cause of action has been created by Congress. Because the sovereign is immune from suit absent its consent to suit, federal jurisdiction is lacking in suits not based upon a Congressionally created cause of action. As the court stated in Laycock v. United States, 230 F.2d 848 (9th Cir.), cert. denied, 351 U.S. 964, 76 S.Ct. 1028, 100 L.Ed. 1484 (1956):

"It is axiomatic that: 'Consent alone gives jurisdiction to adjudge against a sovereign.' . . . This is so, even in cases grounded upon alleged violations by the Government of Federal constitutional rights." Schillinger v. United States, 155 U.S. 163, 168, 15 S.Ct. 85, 39 L.Ed. 108 (1894). 230 F.2d at 850.

*Cf.* Bell v. Hood, 71 F.Supp. 813 (S.D.Cal.1947), on remand from 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); United States v. Faneca, 332 F.2d 872

The Court of Claims has exclusive jurisdiction of such claims in excess of $10,000. 28 U.S.C. § 1491 (1970).

3. See note 2, *supra.*

(5th Cir.), cert. denied, 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1964); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 409 F. 2d 718 (2d Cir. 1969), rev'd 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

In *Bivens, supra,* the Supreme Court recently held that federal courts have the power, even in the absence of a federal statute specifically authorizing such a cause of action, to award damages to an individual in a suit against federal agents based upon a violation of the Fourth Amendment's restriction against unreasonable searches and seizures. Because the Court of Appeals had not ruled on the question of immunity of the federal agents from liability by virtue of their official position, the Supreme Court did not reach that question. On remand, the Court of Appeals held that federal agents enjoy no official immunity from suits in federal courts for tortious activity in the execution of a search or arrest. 456 F.2d 1339 (2d Cir. 1972). It should be noted that on remand the Court of Appeals ruled only on the issue of official immunity—it did not decide whether the Government should be liable on the common law theo-ry of *respondeat superior* for the constitutional torts of its agents.[4]

Thus, the instant case must be distinguished from the *Bivens* case on the ground that plaintiff here brought its suit not against federal agents but against the United States, which remains immune from suit except in those limited situations in which consent to suit has been authorized by a statute of Congress.[5] Plaintiff's claims against the United States of a denial of due process and equal protection of the laws, therefore, add nothing to its complaint, and its cause of action in the circumstances of this case must be adjudicated within the provisions of the Tucker Act, 28 U.S.C. § 1346(a)(2) and the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. (1970).

What has been said above about plaintiff's claim of denial of due process and equal protection of the laws applies with equal force to its allegation that the United States violated Article IV, Section 4 of the Constitution in its alleged negligent failure to protect the District of Columbia against domestic violence. In addition, it is clear from the constitutional and statutory framework, Article II, Section 2; Article IV,

---

4. Since the Supreme Court, as was noted above, did not reach the question of official immunity, it did not of course consider the related question of the vicarious liability of the United States Government for the constitutional torts of its agents. Mr. Justice Harlan, however, in his opinion concurring in the judgment of the Court, remarked: "However desirable a direct remedy against the Government might be as a substitute for individual official liability, the sovereign still remains immune to suit." 403 U.S. at 410, 91 S. Ct. at 2012.

5. The situation in *Bivens, supra,* must be distinguished from that in the instant case on two other grounds. First, legislative and judicial efforts to protect Fourth Amendment rights have been unique. Both the majority and concurring opinions in *Bivens* stress the inadequacy in many cases of remedies other than federal damage actions in vindicating Fourth Amendment rights. Neither the exclusionary rule

nor the availability in certain instances of injunctive relief, criminal sanctions, or state causes of action in damages has been sufficient to deter unreasonable searches and seizures. Thus, the question, as Mr. Justice Harlan sees it, is "whether compensatory relief is 'necessary or appropriate' to the vindication of the interest asserted." 403 U.S. at 407, 91 S.Ct. at 2010. Second, the search and arrest activities of the federal agents complained of in *Bivens,* unlike the riot control activities of the military and police in the instant case, have been held to be "ministerial" rather than discretionary and thus not protected from potential liability in an action for damages. Bivens v. Six Unknown Named Agents of Federal Bur. of Narcotics, 456 F.2d 1339 (2d Cir. 1972), on remand from 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed. 619 (1971); Carter v. Carlson, 144 U.S.App.D.C. 388, 447 F.2d 358 (1971), rev'd on other grounds sub nom., District of Columbia v. Carter, —— U.S. ——, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

Section 4; 10 U.S.C. §§ 331–334 (1970), that the decision whether to use troops or the militia (National Guard) in quelling a civil disorder is exclusively within the province of the President. The Courts also have made it clear that presidential discretion in exercising those powers granted in the Constitution and in the implementing statutes is not subject to judicial review. Luther v. Borden, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1848); Martin v. Mott, 25 U.S. (12 Wheat.) 19, 6 L.Ed. 537 (1827); Alabama v. United States, 373 U.S. 545, 83 S.Ct. 1365, 10 L.Ed.2d 540 (1963).

In National Board of Young Men's Christian Ass'ns v. United States, 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969), the Court held that the Fifth Amendment did not require that a private party be compensated for damages to its buildings resulting from misconduct by rioters following occupation of the buildings by government troops. In so holding, the Court applied the following test:

> [W]here, as here, the private party is the particular intended beneficiary of the governmental activity, 'fairness and justice' do not require that losses which may result from that activity 'be borne by the public as a whole,' even though the activity may also be intended incidentally to benefit the public. See Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960), United States v. Sponenbarger, [308 U.S. 256, 266, 60 S.Ct. 225, 84 L.Ed. 230 (1939)]. 395 U.S. at 92, 89 S.Ct. at 1515.

Mr. Justice Harlan, in his opinion concurring in the result in the *YMCA* case, noted the ambiguity of the phrase "particular intended beneficiary," and stated that he did not disagree with the language of the Court quoted above,

> . . . if it means that the Fifth Amendment does not apply whenever the policing power reasonably believes that its actions will not increase the risk of riot damage beyond that borne

by the owners of unprotected buildings. 395 U.S. at 97, 89 S.Ct. at 1518.

Mr. Justice Harlan's proviso to the formula applied by the Court in *YMCA* restated the general principle which he set forth at the outset of his concurring opinion:

> . . . it appears to me that, in riot control situations, the Just Compensation Clause may only be properly invoked when the military had reason to believe that its action placed the property in question in greater peril than if *no* form of protection had been provided at all. 395 U.S. at 95, 89 S.Ct. at 1517 (emphasis in original).

Mr. Justice Harlan concluded that:

> . . . . it is for the Congress, not this Court, to decide the extent to which those injured in the riot should be compensated, regardless of the extent to which the police or military attempted to protect the particular property which each individual owns. 395 U.S. at 96, 89 S.Ct. at 1518.

■ In contrast to the *YMCA* case, there is in the present case no allegation that plaintiff's property was ever actually occupied by government forces. Nor does plaintiff assert that its property would have been safer with no protection provided by troops and police; on the contrary, plaintiff alleges that the protection afforded by the government was too little, too late. Therefore, under either formula for recovery of compensation set forth in the *YMCA* case, that of the majority which provides that compensation can be claimed only for the *increased* damage resulting from the troops' presence (395 U.S. at 93, 89 S. Ct. 1511), or that of Mr. Justice Harlan, which provides that compensation can be recovered only where the military action placed the property in greater peril than if *no* form of protection had been provided at all, plaintiff's allegations in the instant case do not set forth any ground for recovery of compensation from the government based on a taking of property for public use.

Plaintiff's allegations that the riot control program formulated and adopted by officials of the United States and the District of Columbia intentionally sacrificed private property in disturbance zones in order to further the public purpose of disturbance control, likewise do not establish a Fifth Amendment taking of property for public use without just compensation. Plaintiff contends that the public purposes for which its property was sacrificed include specifically: (1) protection of government buildings and private property in various areas by sealing off riot-torn areas and giving free rein to arsonists and looters in those areas; (2) prevention of serious injury or death to persons in those disturbance zones; and (3) protection of police, fire and military personnel. But judgments about where troops or police should be stationed and what degree of force should be exerted to provide adequate protection for persons and property in riot control situations are precisely the judgments which in the opinion of Mr. Justice Harlan, concurring in the judgment of *YMCA*, "are best left to officials directly responsible to the electorate." 395 U.S. at 95, 89 S.Ct. at 1517.

▪ Plaintiff contends that the United States is liable in damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. (1970), for the losses suffered by plaintiff as a result of the alleged negligence of the government in formulating and implementing its riot control activities.[6] The Federal Tort Claims Act, however, specifically excepts from its coverage:

> Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an em-

ployee of the Government, whether or not the discretion involved be abused. 28 U.S.C. § 2680(a) (1970).

The leading interpretation of the discretionary function exception is to be found in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), where the Court stated:

> It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. Where there is room for policy judgment and decision there is discretion. 346 U.S. at 35–36, 73 S.Ct. at 968.

In *Dalehite,* suit was brought against the United States under the Federal Tort Claims Act for damages resulting from a disastrous explosion of ammonium nitrate fertilizer, produced by the United States for export to occupied countries at the close of World War II. The District Court in that case found that the explosion resulted from negligence on the part of the Government in adopting the fertilizer program as a whole, in its control of various phases of manufacturing, packaging, labeling, and shipping the product, in failing to give notice of its dangerous nature to persons handling it, and in failing to police its loading on shipboard. The Supreme Court held that the acts of negligence found by the District Court did not subject the Government to liability:

> The decisions held culpable were all responsibly made at a planning rather

---

6.  28 U.S.C. § 1346(b) provides, in pertinent part:
    > . . . the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent

or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program. 346 U.S. at 42, 73 S.Ct. at 971.

Plaintiff argues that the *Dalehite* case "has been overturned or significantly 'modified' by later Supreme Court cases," citing Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L. Ed. 48 (1955), Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L. Ed.2d 354 (1957).

In *Indian Towing Co.*, suit was brought against the United States under the Federal Tort Claims Act, seeking recovery for damages alleged to have been caused by the negligence of the Coast Guard in the operation of a lighthouse. The question in that case, as the Court stated it, was one of "liability for negligence at what this Court has characterized the 'operational level' of governmental activity. Dalehite v. United States, 346 U.S. 15, 42, 73 S.Ct. 956, 97 L.Ed. 1427." The Government in fact conceded that the discretionary function exception of 28 U.S.C. § 2680(a) was not applicable to its activities in operating lighthouses, but the Government contended that:

> the language of § 2674 (and the implications of § 2680) imposing liability 'in the same manner and to the same extent as a private individual under like circumstances . . .' must be read as excluding liability in the performance of activities which private persons do not perform. Thus, there would be no liability for negligent performance of 'uniquely governmental functions.' 350 U.S. at 64, 76 S. Ct. at 124.

The Court rejected the Government's position and held that the Federal Tort Claims Act does not impliedly incorporate the distinction between "governmental" and "non-governmental" functions which, in the opinion of the Court, has caused confusion in the law of municipal liability for torts. The mere fact that the Coast Guard operates all or most lighthouses renders that activity "governmental," in a manner of speaking, but that in no way removes the activity from the "operational level." With regard to such activity, the Court concluded:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order. . . . 350 U.S. at 69, 76 S.Ct. at 126.

The Court in *Indian Towing Co.*, therefore, left intact the *Dalehite* distinction between discretionary and operational governmental activity, and it did not question the conclusion in *Dalehite* that the government's decisions in that case involved policy judgments at the planning level directly related to the political objective of providing food in occupied countries, in order to satisfy its obligations as an occupying power.[7]

In *Rayonier, supra*, suit was brought against the United States under the Federal Tort Claims Act, seeking to recover damages caused by the alleged negligence of employees of the Forest Service in fighting a fire. Again, the Court was dealing with governmental activity entirely at the operational level. The Forest Service had entered into an agreement with the State of Washington to protect against and to suppress any fires in an area which included the public lands where the fires started and adjacent lands privately owned. The owners of the adjacent private lands were aware of the contract and relied on the Forest Service to control and put out any fires in the area covered by the agreement.

---

7. 346 U.S. at 19, 73 S.Ct. 956. The Court cited the United States' obligations under The Hague Conventions of 1899 (II) and 1907 (IV) Respecting the Laws and Customs of War on Land, Article 43.

As in *Indian Towing, supra,* the Court in *Rayonier* held that in determining the liability of the United States for negligence in performing these activities at the operational level, the United States must be considered as a "private person" and not a municipal corporation for purposes of applying "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). 352 U.S. at 318, 77 S.Ct. at 376. Again, the Court in *Rayonier* did not, as plaintiff argues, "overturn" or "significantly modify" the *Dalehite* distinction between discretionary and operational activity or the Court's conclusion in *Dalehite* that the government's activity there involved policy judgments at the planning level.

Plaintiff contends that the Government in the instant case really had no discretion at all in carrying out its obligation to restore order in the civil disturbances in question here. As plaintiff would have it, the Government "agreed" to assume a legal duty imposed upon it by "statutes and otherwise"[8] to protect private property and engendered reliance upon such protection on the part of property owners. Thus governmental activity in quelling a riot would be entirely operational and subject to the same standard of care as if the government were merely operating a lighthouse or putting out a forest fire.

Such an interpretation of the scope of governmental discretion in formulating and implementing a riot control program is unreasonably narrow and artificial. Policy considerations directly related to objectives which are, in the strictest sense of the term, governmental or political pervade every phase of planning and executing a riot control program. Such considerations point not only to discretionary functions free from liability un-

der the Tort Claims Act but to political questions which are beyond the jurisdiction of this Court. Among the matters of policy suggested in the government's brief in support of its motion to dismiss are the following:

1.  Presidential use of military power under Article II, Section 2; Article IV, Section 4; and 10 U.S.C. §§ 331–334, 1970;[9]

2.  Military manpower and operations in the United States and abroad as affected by simultaneous disturbances in several American cities;

3.  Military preparedness for and expertise in riot control tactics;

4.  Foreign relations, as affected by civil disturbance in the United States and the use of military force to suppress it;

5.  Federal-state relationships, as affected by excessive reliance on federal forces and the threat to the safety of the nation's capital.

The presence of similar policy considerations led the Court to deny relief in Smith v. United States, 375 F.2d 243 (5th Cir.), cert. denied, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967). In that case, plaintiff, a grocery store owner, had been a juror in a controversial civil rights case in Georgia. He alleged a conspiracy on the part of civil rights militants to retaliate against him by injuring his business through a group boycott and sought recovery against the Government for the alleged negligent failure of the FBI to investigate and of the United States Attorney to prosecute the militants. He argued that there is an affirmative duty on the part of the Government to investigate and prosecute crime and that, when there is a "clear

---

8.  Plaintiff reasons that the legal duty to protect property is assumed by the United States as the governmental entity both for the nation as a whole and for the District of Columbia, and arises from such statutes as D.C.Code §§ 4–119, 4–126, and 4–143; and from common law as well.

9.  As was noted above, Presidential discretion in exercising the powers granted in Art. II, Sec. 2; Art. IV, Sec. 4, and 10 U.S.C. §§ 331–334 (1970), is not subject to judicial review. Luther v. Borden, *supra;* Martin v. Mott, *supra;* Alabama v. United States, *supra.*

violation" of a federal statute, the discretionary function exception is inapplicable. The Court, however, affirmed the granting of the Government's motion to dismiss, basing its decision on the section 2680(a) discretionary function exception to the Tort Claims Act. The basis of the Court's holding was that the decision whether to prosecute or not may involve matters of policy apart from the question of probable cause and if that decision were not held in every case to be absolutely discretionary, it "might be influenced by a plaintiff with no governmental responsibility." 375 F.2d at 247.

Another holding could diffuse the government's control over policies committed to it by the Constitution, and irrationally concentrate political responsibility in fortuitous lawsuits. Whatever else § 2680(a) may do, its discretionary function exception prevents this diffusion of governmental power into private hands. The United States is immune from liability in the present case not because of the mere fact that government officials made choices, but because the choices made affected the political (not merely the monetary) interests of the nation. The Act is intended to spread monetary losses in certain cases among the taxpayers; it is not intended to affect the distribution of political responsibility. 375 F.2d at 248.[10]

Finally, Mr. Justice Harlan's remarks in *YMCA, supra,* quoted above, with regard to claims based upon "inadequate" protection by the government in riot situations, are just as pertinent in the context of the Federal Tort Claims Act as they are in the context of the Tucker Act. As Mr. Justice Harlan concluded:

. . . it is for the Congress, not this Court, to decide the extent to which those injured in the riot should be compensated. . . ." 395 U.S. at 96, 89 S.Ct. at 1518.[11]

◼ Plaintiff contends that the United States has a duty, arising from the common law and ancient English statutes as part of the common law, to compensate plaintiff for its losses suffered as a result of civil disturbances. This duty, plaintiff argues, is epitomized in the notion of the "social contract" between the state and its citizens to preserve social order and the property of the citizens against mob violence. The answer to plaintiff's contention is that,

. . . in the absence of legislation, municipalities and other governmental bodies are not pecuniarily responsible for destruction and injury wreaked by

10. *See also* United States v. Faneca, 332 F.2d 872 (5th Cir. 1964), cert. denied, 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965); but *cf.* Swanner v. United States, 275 F.Supp. 1007 (M.D.Ala.1967), rev'd on other grounds, 406 F.2d 716 (5th Cir. 1969). Swanner had been an informer for the Government, and as a result of his information indictments had been brought against certain individuals who had allegedly threatened him. Three days before the scheduled trial of the individuals involved, Swanner's house was bombed, injuring him and several other members of his family. The Court held that the United States had a special duty to Swanner arising from the informer relationship and that its decision not to provide protection under such circumstances did not come within the discretionary function exception to the Federal Tort Claims Act. The Court cited United States v. Muniz, 374 U.S. 150, 83 S.Ct.

1850, 10 L.Ed.2d 805 (1963); In re Quarles, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895); Cohen v. United States 252 F.Supp. 679 (N.D.Ga.1966); and Shuster v. City of New York, 5 N.Y. 2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958).

11. It should be noted that after the decision in *Dalehite, supra,* compensation by means of a private relief bill was granted to individuals injured as a result of the Texas City disaster. Claims which had been covered by insurance, however, were excluded. Act of August 12, 1955, 69 Stat. 707, Sec. 6.

After the 1968 civil disturbances, proposed legislation was introduced in Congress to provide compensation for injuries suffered by individuals as a result of criminal activity, but Congress has enacted no legislation to this effect. *See, e. g.,* Senate Bill No. 9, 91st Cong. and Senate Bill No. 2155, 89th Cong.

rioting mobs. See Louisiana ex rel. Folsom v. Mayor and Administrators of New Orleans, 109 U.S. 285, 287–288, 3 S.Ct. 211, 27 L.Ed. 936 (1883); Turner v. United States 248 U.S. 354, 357–358, 39 S.Ct. 109, 63 L.Ed. 291 (1919). . . . No reported case holds a governmental body liable in these circumstances, or indicates that there could be liability without a statute or ordinance. All the statements by courts are the other way. Westminster Investing Corp. v. G. C. Murphy Co., 140 U.S.App.D.C. 247, 249, 434 F.2d 521, 523 (1970).

Plaintiff cites the decision in City of Chicago v. Sturges, 222 U.S. 313, 32 S. Ct. 92, 56 L.Ed. 215 (1912) as supporting the proposition that statutes authorizing recovery for riot damages merely effectuate the common law duty of a governmental entity to compensate riot losses and that such statutes do not of themselves create that duty nor are they necessarily prerequisite to judicial recognition of a right to recovery at common law. But the Court in *Sturges* had before it a state statute that imposed absolute liability upon cities to indemnify owners of property for damages occasioned by mobs and riots. In sustaining that statute, the Court held that such a law did not exceed legislative power and looked to the common law, including the statutes of Winchester, only to demonstrate that imposition of liability upon a community was not without historical roots in the common law and was based on reasonable grounds of social policy.[12]

In holding that an individual citizen has "[no] substantive right to recover the damages resulting from failure of a government or its officers to keep the peace," Turner v. United States, *supra*, 248 U.S. at 358, 39 S.Ct. at 110, the Court in *Westminster, supra,* decided that it should not "judicially create for the District, a new principle of municipal responsibility." 140 U.S.App.D.C. at 249, 434 F.2d at 523. The Court noted "the extremely broad scope of policy choices to be made in deciding whether there should be liability and, if so, in formulating the rules," and concluded that it was "appropriate to follow the accepted understanding that liability should be imposed, if at all, by the cognizant legislative body, not by the judiciary acting on its own." *Id.* at 249, 434 F.2d at 523. *Cf.* National Board of Young Men's Christian Ass'ns v. United States, *supra*, 395 U.S. at 95–96, 89 S.Ct. 1511 (Harlan, J., concurring in the judgment).[13]

12. The Court in *Sturges* cited particularly: . . . a series of statutes, beginning possibly in 1285, in the statutes of [Winchester, 13 Edw. I, c. 1], coming on down to the 27th Elizabeth, [c. 13], the Riot Act of George I (1 Geo. I, St. 2) and Act of 8 George II, chap. 16 . . . 222 U.S. at 323, 32 S.Ct. at 93.

D.C.Code § 49–301 (Supp. V, 1972) provides, in pertinent part:
The common law, all British statutes in force in Maryland on February 27, 1801, the principles of equity and admirality . . . in force in the District of Columbia on March 3, 1901, shall remain in force except insofar as the same are inconsistent with, or are replaced by, some provision of the 1901 Code.
Plaintiff concedes that it can find no evidence that the English statutes mentioned in *Sturges, supra,* were "in force" as statutes in Maryland in 1801. In any event, the rule in this jurisdiction has been that: "British statutes antedating the Declaration of Independence have almost universally been regarded as having the effect of judicial precedent rather than legislative enactment." Manoukian v. Tomasian, 99 U.S.App.D.C. 57, 61, 237 F.2d 211, 214 (1956), cert. denied, 352 U.S. 1026, 77 S.Ct. 588, 1 L.Ed.2d 596 (1957); Association of Western Rys. v. Riss & Co., 116 U.S.App.D.C. 63, 320 F.2d 785 (1963).
In 1835, Maryland enacted one of the first laws in this country providing for governmental liability for damages caused by riots. In its present form, the statute is found in Article 82, Sections 1–3 of the Annotated Code of Maryland (1957). This statute, however, was not "in force" in 1801 and so does not remain in force in the District of Columbia under D.C. Code § 49–301.

13. Although not asserted by plaintiff Monarch Insurance Co., three other allegations appear in certain of the actions consoli-

In light of the foregoing, the motion of the United States as to it to dismiss this action for failure to state a claim will be granted. Having reached that conclusion, it is not necessary to consider the alternative motion of the United States for summary judgment and the numerous affidavits and exhibits in support thereof.

## II.

### Claims Against the District of Columbia and The Named Officials

What has been said above with regard to plaintiff's claims against the United States based upon alleged violations of the Fifth and Fourteenth Amendments and of a common law duty to protect plaintiff's property and to compensate it for losses resulting from civil disorders, applies with equal force to plaintiff's assertion of those claims against the District of Columbia and the named officials who are also defendants in this case.[14]

Count I of plaintiff's complaint, which was discussed above with regard to the claims asserted against the United States,[15] alleges a violation by all defendants of plaintiff's rights under 42 U.S.C. § 1983. Because that statute is

---

dated for decision with this case. Count II of the complaint of the Insurance Company of North America, Civil Action No. 262–70, alleges that defendants engendered reliance in their ability to defend the property of plaintiff's subrogors, but failed to do so, and in imposing a curfew, prevented plaintiff's subrogors from defending their own property. Such allegations against the United States fall within the discretionary function exception, 28 U.S.C. § 2680(a) or the exception for misrepresentation, 28 U.S.C. § 2680(h), of the Federal Tort Claims Act. United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). Against the District of Columbia, such allegations would not state a cause of action, Westminster Investing Corp. v. G. C. Murphy, supra.

Paragraph 9 of the complaint of The Home Insurance Company, Civil Action No. 2097–69, and related cases, alleges negligence in failing to alleviate social conditions which were known to lead to riots and disorders. In effect, the government would become an insurer of peace, safety and ideal social order. Such allegations are clearly addressed to the legislative and executive branches of the government and are otherwise barred under the discretionary function exception to the Federal Tort Claims Act and the holding in Westminster, supra.

14. Paragraphs 20 and 21 of the complaint of The Insurance Company of North America, Civil Action No. 262–70, allege that the District of Columbia negligently failed to comply with the provisions of D.C.Code §§ 4–106 and 4–119 (1967). The pertinent provision in § 4–106 is: "The Metropolitan Police Force shall consist of not less than three thousand officers and members. . . ."

D.C.Code § 4–119 provides in part:

It shall be the duty of the Commissioners of the District of Columbia at all times of the day and night within the boundaries of said police district—

First. To preserve the public peace;

Second. To prevent crime and arrest offenders;

Third. To protect the rights of persons and of property;

Fourth. To guard the public health;

Fifth. To preserve order at every public election;

Sixth. To remove nuisances existing in the public streets, roads, alleys, highways, and other places;

Seventh. To provide a proper police force at every fire, in order that thereby the firemen and property may be protected. . . .

Tenth. To enforce and obey all laws and ordinances in force in the District.

. . .

No case in this jurisdiction has held either the District or its officials liable for negligent failure to comply with either of the above statutes. Several cases in other jurisdictions have held that such statutes do not give rise to a cause of action in individual citizens when police or fire protection is inadequate. See, e. g., Steitz v. City of Beacon, 295 N.Y. 51, 64 N.E.2d 704 (1945); Riss v. City of New York, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860, 293 N.Y.S. 2d 897 (1968); cf. Restatement (Second) of Torts, § 288 (1965). See also Hart's Food Stores v. City of Rochester, 44 Misc.2d 938, 939, 255 N.Y.S.2d 390, 391 (Sup.Ct.1965).

15. See note 1, supra, and accompanying text.

inapplicable to claims against the United States, there remain to be examined here plaintiff's allegations under § 1983 against the other named defendants.

■ The question of the potential liability of the District of Columbia and the other named defendants under § 1983, however, has now been settled by the Supreme Court in District of Columbia v. Carter, —— U.S. ——, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), rev'g sub nom. Carter v. Carlson, 144 U.S.App.D.C. 388, 447 F.2d 358 (1971). In *Carter* the Supreme Court held that "the District of Columbia is not a 'State or Territory' within the meaning of § 1983" and thus that § 1983 could not form a basis for liability of the District or its officials for alleged deprivations of constitutional rights. 93 S.Ct. 602. The Court specifically disclaimed any view on the merits of the case insofar as liability was based on other theories of liability.[16] Thus, because the decision of the Court of Appeals in Carter v. Carlson involves important questions with regard to the status of the doctrine of official and sovereign immunity as common law defenses in the District of Columbia, it will still be considered here in some detail.[17] For reasons stated more fully below, however, this Court finds that Carter v. Carlson is inapplicable to all of the other claims asserted by plaintiff in the present case.

As to the common law claims asserted by the plaintiff in *Carter,* the Court looked first to the arresting officer and pointed out that:

> An arrest without probable cause constitutes a tort at common law, as does the use of excessive force to make an arrest. And the law is clear that an arresting officer has no immunity from suit for torts committed in the course of making an arrest. 144 U.S. App.D.C. at 392–393. 447 F.2d at 362–363 (footnotes omitted).[18]

But the arresting officer in *Carter* was never found for service of process, and so the Court turned to plaintiff's common law claims against the officer's supervisors and against the District of Columbia.

First, as to the supervisory officials, the Court held that the claim that they were negligent in failing to give the arresting officer adequate training and supervision should not be dismissed on the ground of official immunity unless the officials first established that their responsibilities for training and supervision were wholly discretionary.[19] In determining whether a particular function of the supervisory officials is discretionary, the Court would consider "whether

16. 93 S.Ct. 602 n. 3.

17. The complaint in *Carter* alleged:
   . . . that in 1968 one police officer Carlson arrested appellant Carter without probable cause in a bar and, as Carter was being held by two other officers, proceeded to beat him with brass knuckles. The complaint further alleged that Carlson's precinct captain, and the Chief of Police, and the District of Columbia each negligently failed to train, instruct, supervise, and control Carlson with regard to the circumstances in which (1) an arrest may be made, and (2) various degrees of force may be used in making an arrest.
   Carter sought to hold Carlson liable for assault and battery, or for negligence in making an arrest. He sought to hold precinct captain Prete and Police Chief Layton liable for neg-

ligence in failing to give Carlson adequate training and supervision. Finally, he sought to hold the District of Columbia liable either for its own negligence in failing to train and supervise Carlson, or for the torts of Carlson, Prete, and Layton on a theory of *respondeat superior.* In each case, he asserted both a common law tort theory of liability, and an action for deprivation of civil rights under 42 U.S.C. § 1983. 144 U.S.App.D.C. at 390–391, 447 F.2d at 360–361.

18. See the cases cited by the Court *id.* at 392 n. 8, 393 n. 9, 447 F.2d at 362 n. 8, 363 n. 9.

19. See cases cited by the Court holding supervisory officers subject to suit, though not always ultimately liable on the merits, *id.* at 393 n. 12, 394 nn. 14–15, 447 F.2d at 363 n. 12, 364 nn. 14, 15.

an officer is likely to be unduly inhibited in the performance of that function by the threat of liability for tortious conduct." 144 U.S.App.D.C. at 392, 447 F.2d at 362.[20]

Second, as to the common law claims against the District of Columbia in *Carter*, the threshold question is whether the District is protected from suit by the doctrine of sovereign or governmental immunity.[21] The Court found that since an arresting officer can be subject to liability in tort for false arrest or assault, there is no additional threat to the efficiency of that particular governmental activity in subjecting the District to suit as well as the arresting or supervisory officers. The Court therefore held that the act of making an arrest is *ministerial* rather than discretionary for the purposes of the doctrine of sovereign immunity set forth in *Spencer, supra*.[22] The Court concluded that the District may be vicariously liable for the intentional torts of an arresting officer and the failure of supervisory officers adequately to train and control him.

Should it not be possible, in the circumstances of a given case, to reach the District under a theory of vicarious liability, the District might still be liable directly for negligence in failing adequately to supervise, train and control its police officers. The foundation for such direct liability is the common law duty imposed on the District to supervise, train and control its police officers. The District Court in Thomas v. John-

son, 295 F.Supp. 1025, 1030–1033 (D.D. C.1968), cited approvingly by the Court in *Carter*, held that the District of Columbia as a corporate entity has such a duty with regard to its police officers. Again, an ultimate defense to an alleged breach of that duty would be that the activities of the officers were discretionary, but the District enjoys no threshold immunity to such a claim.

None of the holdings in *Carter* as to the potential liability at common law of an arresting officer, his supervisory officers, or of the District itself is applicable to the facts in the present case. It should be noted preliminarily that plaintiff here relies on *Carter* on the assumption that, if the District of Columbia and supervisory police officials could be found potentially liable in *Carter* for the tortious conduct of an officer making an arrest, then conversely similar liability could be found for the *failure* to make arrests. Such a failure to make arrests constitutes the gravamen of plaintiff's claims against the District and the named officials in this case. There is, of course, quite a leap from establishing liability for tortious conduct in the actual execution of an arrest, an activity which the Court in *Carter* declared to be ministerial, and establishing liability for failure to make arrests in controlling a riot, an activity which is pervaded with discretionary choices.

It is not necessary, however, to rely on the distinction between discretionary and ministerial activity or to

20. See Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) ; David v. Cohen, 132 U.S.App.D.C. 333, 407 F.2d 1268 (1969) ; *Cf.* Spencer v. General Hospital, 138 U.S.App.D.C. 48, 425 F.2d 479 (1969) ; Graham v. District of Columbia, 139 U.S.App.D.C. 378, 433 F.2d 536 (1970) ; Elgin v. District of Columbia, 119 U.S.App.D.C. 116, 337 F. 2d 152 (1964). A function is discretionary under *Spencer, supra*, if it is "of such a nature as to pose threats to the quality and efficiency of government in the District if liability in tort was made the consequence of negligent act or omission."

138 U.S.App.D.C. at 51, 425 F.2d at 482.

21. See cases cited note 20, *supra.* As the Court in *Carter* observed, because the doctrines of sovereign and official immunity serve the same purpose, it is not surprising that the common law in this jurisdiction has developed the same criteria for both kinds of immunity. 144 U.S. App.D.C. at 397, 447 F.2d at 366.

22. *Accord,* Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 456 F.2d 1339 (2d Cir. 1972), on remand from 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed. 619 (1971).

question the holdings in *Carter* as to the availability of official or sovereign immunity as a threshold defense in order to distinguish *Carter* from the present case. Nothing in *Carter* disturbs the holding in *Westminster, supra,* that the District of Columbia, in the absence of a statute providing otherwise, has no duty to protect citizens from riot damage. The lack of such a duty makes it unnecessary to decide the question of the possible immunity of either the District, its officials or its officers on the street. Indeed, the Court in *Carter* cited *Westminster* precisely on those points, contrasting *Westminster* and Thomas v. Johnson, *supra,* which held that the District as a corporate entity has a duty to supervise, train and control its police officers. 144 U.S.App.D.C. at 398, 447 F. 2d at 368. And the Court in *Westminster* clearly addressed itself not only to the question of the duty of the District to protect its citizens from riot damage but also to the question of its duty to train its police in riot control. 140 U.S. App.D.C. at 248, 434 F.2d at 522.

■ The Court in *Westminster* concluded that appellant therein could prove "no set of facts in support of its claim which would entitle it to judicial relief." *Id.* at 252, 434 F.2d at 526, and thus rejected appellant's plea that it be permitted to complete its process of discovery. Likewise here, plaintiff can prove no set of facts which would entitle it to judicial relief against the District or its officials based solely on common law tort theory, and there is thus no reason to deny defendants' motion to dismiss merely on the assumption that some evidence might otherwise be discovered to support plaintiff's claims.

In light of the foregoing, the motions of the defendants, District of Columbia, Walter E. Washington, and John B. Layton, to dismiss this action for failure to state a claim will be granted. An appropriate order is being entered with this opinion.